Good morning. May it please the court. I'm Bruce Motz and I represent Brooke Sanderson, the appellate plaintiff in this matter, and Ms. Sanderson is in the court with us here today. I want to make one thing that I think is important about the context that you're reviewing this case. And it might be kind of confusing as I look back over the briefing. I want to make sure the court understands that Brooke Sanderson was the member of two different entities within the patrol. One was the canine team and one was Division O, the executive protection detail. And she was formally a part of Division O and her supervisor, then a direct supervisor, was Lt. George Nyken there with Division O. Now the canine team, within the first year of Ms. Sanderson being involved in that, was taken over by Captain Jim Thomas. And he is not in her direct line of supervision as you will see in the depositions. He mainly just runs it. It was a little confusing about exactly how it played out. But it's very important because Captain Thomas and the canine team and their reception of Brooke Sanderson is important here. And then you also have then members of Division O, which are not members of the canine team, which also then play a role here. So which of those two groups, the canine team or Division O, is the group that she particularly alleged had a culture against women? Frankly, I think it would be particularly the canine team. But it was both. And yet, most of her dealings were with the Division O people, were they not? Yes, yes, exactly. And that's one of the things that we raised. She did have dealings with them on canine training and some of that stuff, but most of it was with the Division O people. Yeah, most of it was Division O people. But yet when there were complaints, they were raised initially against her, were raised initially by members of the canine team who said that she had created an environment where they didn't want to work with her. And that was, as you see in the record and in the emails involving Captain Thomas and the head of patrol, Colonel Haller, which he reports there that there are two officers, primarily Officers Beck and Deckert, who he speaks with, who say that she's created this environment where they don't want to work with her. And what's really remarkable about that is, just to your point, Judge Vail, that they only had, Trooper Deckert only said he had only about four occasions to even work with her during this whole ten months. And yet somehow we get the Colonel learning that she's created this environment. Same with Trooper Beck. He had only seen her about four times on there. And I think it's important in the facts section of the appellee's brief, they make some allegations about her performance here. And it's important, they cite that, the opinions of Deckert and Beck that she was creating that kind of environment, that she didn't have good communication skills. And so the question is, why then did these two officers report this, when in fact at the same time my client is reporting that they're ignoring her and shunning her. So we've got these two reports going and they both go to Captain Thomas. She makes that to Captain Thomas as well, as well to Lieutenant Nyken. She talks about the refusal of the officers to work with her. So I wonder, you know, the question is, why would these two officers then kind of jump to this conclusion that in fact. Excuse me. Yes. I'm getting lost here. You're trying to explain why there was sufficient evidence to show a hostile work environment, is that correct? Yes, I am. So focus there. Okay. Yeah, well, let's do that. And to your point, I think the crux of the dispute there, Judge Hart, is whether in fact the incidents were pervasive enough to create a hostile environment. I think that's the crux. The patrol says that no, they are not. The district court found, in a rather brief later opinion, that there were some rumors about her and sexual conduct, but those were fleeting rumors. Apparently you had a two-page brief on hostile work environment in response to the motion for summary judgment. Is that correct? I'm sorry, not a two-page brief. The argument response on hostile work environment was about two pages, and you listed some incidents briefly. So we should limit ourselves to what you raised in response to the motion for summary judgment. I'm not sure that you didn't go beyond that. Your brief is a lot more than two pages long on the subject. So if you're going to go beyond what you argued in the response to the motion for summary judgment, you need to explain why you're allowed to do that, and please identify when you've done that. Because I'm not ñ I'd like to restrict us to what you said. I believe that is, of course, appropriate. We are to restrict ourselves to what the judge knew at the time he made the summary judgment. And the rumors were in there, the rumors we talked about. And the rumors were that, in fact, that Brooke Sanderson had, because she had a relationship with a Captain Stoker, that that, in fact, led her to get this K-9 physician and this Division O physician, and that she had experienced those rumors since she had joined Division O. And in the response to the motion for summary judgment, what evidence in the record did she refer to to show that she knew about these rumors? That text messages between her and Captain Stoker, and in addition, in the depositions of Captain Stoker, he spoke about this, and he actually came to Brooke Sanderson after he learned of the rumors, went to her and asked her, hey, have I been sending you any inappropriate text messages of a sexual nature? And her response was, no, but I'm sorry that you've had to get caught up in these rumors that always swirl around me, and when I get a physician, like previously, to the 300 days, and there's an argument about whether we can look at those or not, but she had those same kind of rumors there, and those are in the record. Let's assume you can look at those, which makes sense to me. Were those mentioned in the response to the motion for summary judgment? That's what I really want to keep in mind. Yes, yeah, and they're all in those text messages. That's mentioned in there, okay. Yes, and they're all in the summary that was in the record when the judge made the summary judgment decision. It needs to be more than in the record. It needs to be brought to the judge's attention, so that's why I'm not restricting you to the record at the time of summary judgment. I'm restricting you to what was argued to the district court. We don't ask the district court to search the record to see if there's more information that might support or oppose summary judgment. We ask the judge to make a decision based on what's presented in the motion for summary judgment and the response and the reply. So was all that brought to the attention of the court in the summary judgment motion? Yes. So can I go through some of these allegations and just have you give me a one-word answer? Okay. Yes or no. The question is, was this argued before the district court in the summary judgment argument, okay? Okay. All right. Number one, that she faced rumors of sexual promiscuity about sleeping with some of the friends. Yes. Okay. Number two, that she used sex to gain advantages like a new patrol car. Yes. Number three, that she was called a division bicycle. Yes. Number four, that she was an assertive female. She had the reputation of being assertive. I believe so. I believe that, yes, we argued that she was seen more as a bitch because of that. Sorry for using that word. Number five, that Division O said she would be hard to work with. Yes. That was, well, their contention was that she had, that, I don't know, we argued, that she had made it so that K-19 did not want to work with her. Okay. That the Division O did not accept females. Argued, argued to the court. I'm uncertain if that was argued to the court. That she flirted with a local law enforcement officer during a national high school rodeo. Yes. That she said she was being treated by, like shit with coworkers. Pardon me? She said that she was tired of being treated like, the S word, I guess it's no secret to anybody now what that word is. Oh, okay. About my coworkers. Again, I'm not uncertain if that was brought up in actual argument, Your Honor. That she was, rumors that she had sexual messages with Captain Stoker. Yes. That rumors that she had an affair with someone in a leadership position in K-9. Yes. That was, that came from. These were argued in briefing or oral argument in the context of summary judgment. Yes. Okay. I guess that's all. And it's those things that I'm talking about, and especially the rumors. I mean, if you look at the, I don't know if this is argued actually, that the troopers brought it up. Well, I think I did argue that it was so prevalent, the talk, the rumors about Brooke Sanderson were so prevalent that they couldn't even tell us who had told them about it. They said it was so common, the talk was common. But this was argued with the district court. I mean, we can't say who was it that said the rumor, but we are telling you, district court, that these rumors were pervasive or at least were circulated in my environment. Yes. Okay. All right. Well, we'll read the record. I would reserve the rest of my time. Thank you. Well, somebody did it. It actually, yeah. May it please the court. Counsel? My name is Jesse Naiman. I think you can raise, there's a, yeah, there and there. Thank you, Your Honor. I'm counsel for the Highway Patrol. We're here to ask the court today to affirm the district court's judgment in all respects. I'm mainly going to address the hostile work environment claim today. The district court reviewed the record before it, and after viewing the evidence in the light most favorable to Trooper Sanderson, concluded that all we had here were occasional fleeting rumors, a reference to a word I, douching, and generally unfriendly behavior, and concluded that there is not enough for a reasonable jury to find that Trooper Sanderson was subject to a hostile work environment. Was his conduct pervasive? No, Your Honor, it was not. It did not go on for a long period of time, like during her entire period of working in Division O? Certainly not, Your Honor, and I'd like to address the rumors. So the rumors just started and stopped and things were good after that? The record is unclear about when the rumors started and stopped. The record is clear that a lot of people heard rumors about Trooper Sanderson, but I'd like to draw this Court's attention to the second element of the hostile work environment claim, and that is that the plaintiff in question was subject to unwelcome harassment, and the key word here is harassment. In her deposition, I asked Trooper Sanderson how often when she was on Division O did she hear about these rumors. She mentioned she heard about a rumor between, I believe, her and Captain Stoker on one occasion, and she mentioned she spoke about this rumor to Captain Stoker, and I asked her if she recalled other times hearing about this rumor while she was on Division O. In addition, any other rumors she heard about while she was on Division O, and she could not recall. In light of that, these rumors, along with other items mentioned in the brief, can't be said to be pervasive. So you're saying, however pervasive the rumors may have been, she can only testify to of her hearing about the rumors on one occasion? That's my interpretation of the quotes from her deposition that the Eppleys put in her brief and in the Eppleys supplemental appendix. That is correct, Your Honor. Do we look at information that was gleaned during discovery, where it was, I think, revealed that rumors preceded her knowledge of them? Respectfully, no, Your Honor. Under Byrd v. West Valley City, a 2016 case cited in the Eppleys brief and cited on multiple occasions, this Court has to consider how the plaintiff perceived her environment at the time, not what she learned in discovery. So to the extent that Trooper Sanderson learned about rumors in discovery, they can't be considered under the Byrd case. And because she heard about them so infrequently, the district court was correct to refer to them as occasional and fleeting. Well, you heard the list I read to the appellant. Was there not evidence that she heard those things while on duty? I do believe there was a text message where she mentioned hearing about something with Captain Stoker. Was that in her exchange with Stoker? In the text message exchange? I believe so. I can't swear to that today, but that does sound familiar. My impression had been, and we'll have to look at the record, that that list that I listed, she gave testimony that she heard and encountered those things while on duty. You disagree with that? That's not how I interpreted the record, Your Honor. In addition, I think it's important we parse out certain things that happened while she was on Division J, which is in Laramie and before she joined. But that probably can be considered on the area of hostile work environment, because as long as some of the hostility occurs within the statute of limitations, you can consider predicate things which help inform the environment. So I don't think we can just dismiss comments that she heard before she went to Division O or K-9. Respectfully, Your Honor, I believe the Smith case forecloses that. Smith limits generally the scope of a complaint to the allegations brought in the notice of charge, and this is for policy reasons, which is to ‑‑ Well, excuse me. Okay, go ahead. I'm sorry. I do want to hear your answer to that. Thank you, Your Honor. Smith says that we have to generally limit the allegations in a complaint to the allegations in the scope of the notice of charge, and that is to give the patrol and employers a fair opportunity in notice to respond to the charge and to give the EOC a fair opportunity to do its duty to investigate and resolve the complaint as needed. Do you have any cases specifically addressing hostile work environment in that context? Because then the question is, what do you mean by the claim? If you claim you were subjected to hostile work environment, you're saying you have to include in your EEOC complaint every incident that contributed to that hostile work environment? Not necessarily, Your Honor, because the EEOC notice of charge is a broad document and construed liberally, but here the notice of charge gave no notice whatsoever that the patrol should have considered items that took place in Division J. Furthermore, there are separate problems here. So if the EEOC, she only had a certain limited time period for which she could have brought a complaint into the EEOC, correct? Correct, 300 days. And if she brings that, do you say that before she could invoke this concept of prior hostile work environment situations as informing what the environment really looked like, she would have had to specifically tell the EEOC, I know I'm limited to these 300 days, but informing that will be a lot of bad things that happened to me earlier? Does she need to say that or is that implicit in the case law that says you can look at earlier events to inform what the environment looked like? Well, the case law allows three items from outside of 300 days to be brought in. I still, 300-day rule is a separate rule from the exhaustion rule. Right, but isn't that just, I mean, it's a matter of tensor grid law that you can look at earlier evidence to inform your claim. So she tells the EEOC, my claim is 300 days. There is existing tensor grid law at that time that you can look at earlier evidence. So I'm having trouble why you're saying, well, you can't look at that earlier evidence. The earlier evidence took place in a different environment. It was in a different- With the same company, the same defendant, the same institution. While it was the same institution, Your Honor, it was a different manager. There's testimony that when she was in Laramie, her supervisor at the time was a man named Captain Jones. Captain Jones at the time came in and shut this down. He testifies in his deposition, and this is in the record for this court, that he told the individuals in question to knock off inappropriate behavior related to Trooper Sanderson's gender. For the purpose of summary judgment, the patrol doesn't dispute any of this. But when she came over to the hill with Division O, it was a different environment. And we do believe that the scope is limited to this time frame. But you're saying for two reasons. One, it's not relevant. But earlier you were saying because there's no reference to that earlier period in the EEOC complaint. Correct. We believe that it falls, Your Honor, yes, that it falls outside of the scope of the notice of charge. But in addition, under Duncan v. Management of Public Safety, a 2016 case from this court, because it's not part of the same environment, it's a second and separate reason that items outside of Division J, outside of Division O, I'm sorry, fall off for the purpose of evaluating the summary judgment, the hostile work environment claim. But even if one were to consider these items in Division J, nonetheless, all we have are a few rumors. These aren't severe. It's not, there's no evidence. Well, there are other things besides the rumors. Respond to those. The Duchin comment was inappropriate, but it was isolated and does not appear to have unreasonably interfered with her. How she was treated and excluded? There's no evidence to suggest that any mistreatment, exclusion with Division O and the K-19 were because of sex. Trooper Sanderson compares her case to O'Shea, but this case and O'Shea are light years apart. In O'Shea, there was a work environment where a gentleman by the name of Mr. Jones led, made several different sexist remarks, some of which in general, some were very specific toward the plaintiff. In fact, one of them, one of the more severe ones was Mr. Jones said that Ms. O'Shea was going to sue him for sexual harassment. And it was because of that that Ms. O'Shea said other employees in this work unit decided to ignore her and not treat her well. So because of that bridge between the sexist remarks that Mr. Jones made toward Ms. O'Shea and Ms. O'Shea's observation claim that because of that other people started ignoring her, that's why this court was allowed Ms. O'Shea to use the gender neutral hostile acts as part of the hostile work environment. I mean, for summary judgment purposes, don't we have a bridge here too? The statement that K-9 was generally hostile to females. And so doesn't that then put a gloss on all the things that happened thereafter? I don't believe so. Why not? Why isn't that a similar bridge? We believe that statement is conclusory in nature. It's a bridge, though. I mean, right now we're on a summary judgment. Nonetheless, even viewed in the light most favorable. Who made that statement? Unfortunately, I don't recall. Was there any supporting incidents that said they were generally hostile? No, Your Honor. There were not in the record. In fact, there's also no evidence that Troopers Becker, then Trooper Becker and Trooper Deckard, where Trooper Beckson's been promoted, has been hostile to females. Rather, what the record shows, even viewed in the light most favorable to Trooper Sanderson, is that she just didn't get along with her coworkers. Title VII is not a suit. Was she given information as regards the work? Was she left out of information that was key to her achieving the goals of her employment? While we have to take those facts as true for the purpose of summary judgment, there is no evidence that this was done because she's female. But she alleges that it was done because she was a female. While she does, she doesn't have supporting evidence for that, making it a conclusory statement which would not be admissible. Were other people treated that way who were not female? While there's nothing apparent before this record, no. But I'd just like to remind this Court that the hostile work environment based on sex has to be so severe or pervasive that it alters the terms and conditions of employment. What we have here is behavior that's not severe, not pervasive. But she testified that it was so severe she was thinking of quitting. The reference to that text message, we don't believe is caused because of her sex. But we're not going to make judgments on summary judgment of whether it's credible or not, are we? Regardless of credibility, you are correct, Your Honor, credibility doesn't come in here. But what it comes down to is, I know the text message you're referring to, there's no evidence suggesting that was because of sex. It was more that she just wasn't getting along with the co-workers. Trooper Sanderson, as cited in our brief and in the record, there were instances of her having trouble getting along with people, colleagues, members of the- But there was also evidence that she got along with co-workers just fine before she went to that division. In Division J or O? Well, O, but particularly the canine group. Your Honor, I didn't come prepared to answer that question today, unfortunately. With that, Your Honors, if you have no further questions, we ask this Court affirm the District Court's judgment in all respects. Thank you. Thank you. Your Honors, I think in light of the overall discussion, I think it's appropriate to note that this Court has said in the past that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is essentially a question of fact. And I think that's what we've run into here, is that really all of these things, all the arguments here are really a question of fact about particularly what was the motivation. Again, something I think that's not necessarily appropriate for summary judgment. And that's, you know, what is the motivation? So we've got to look at the whole picture. And I think that's the other thing that I would remind the Court of that I'm sure they are well aware of, that in these kind of cases, you want to look at the whole picture. And what the defense wants to do here is look at each one and say, well, the douching comment doesn't amount to anything. This was only this rumor over here. And instead, you've got to look at that whole picture. And I think on summary judgment, Your Honors, that there are questions of fact that need to be resolved and whether there was a hostile environment for Brooks Anderson. Well, there's an interesting point here about how much of the hostile work environment was gender specific. We have a few incidents that the defendant is not challenging as being gendered. And if there were a lot of those, or if they were very severe, then that would be enough. You've also included, and I'm not going to evaluate that at this point, but you also have things that were more troubling, perhaps, about being isolated, treated poorly. How do we make the connection between that conduct and gender? Well, I think that's where O'Shea comes in. You've got to look. Are there some things that are related to gender here? Are there enough? Yes, and how much? And what's the standard? I think the answers from the court typically have been, you've got to look at it on a case-by-case basis. I haven't been able to find that. Thank you. Thank you. Thank you both for your arguments this morning. The case is submitted. Court is in recess until 1 o'clock this afternoon.